***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications; therefore, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and that the Industrial Commission has jurisdiction over the parties and over the subject matter.
2. That all parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. That an employment relationship existed between the parties from June 1996 until February 2000, and that Perdue Farms was the employer and Robert J. Hammer was the employee.
4. At all times relevant to this action Perdue Farms is and was self-insured for the purposes of meeting the requirements of the North Carolina Workers' Compensation Act.
5. That plaintiff's average weekly wage was $258.99 and that the compensation rate is $172.64.
6. Plaintiff received short-term disability benefits from November 10, 1999 through December 24, 1999, and from March 3, 2000 through June 1, 2000, in the amount of $2,817.20, from an employer sponsored, non-contributory plan.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff was fifty-three (53) years old at the time of the deputy commissioner hearing in this matter. Plaintiff completed the eleventh grade and later earned his GED. Prior to working for defendant-employer Perdue, plaintiff worked for twenty-three (23) years as a truck driver.
2. Plaintiff began working at Perdue Farms' Rockingham, North Carolina facility in June 1996. Plaintiff initially worked in the sanitation department, cleaning machines. After about a year in that job, plaintiff noticed swelling and tingling in his hands. Plaintiff reported these symptoms to Mary Young, the plant nurse.
3. In March 1999, plaintiff transferred to the paws room, where chicken feet were processed. This job consisted of three separate tasks — grading, scales, and boxing. In grading, plaintiff stood at a conveyor line and sorted good chicken feet from bad chicken feet. In scales, the chicken feet fell into plastic bags, which lined boxes. Plaintiff was required to place the plastic bags into the boxes. In boxing, plaintiff was required to take the full boxes, fold the bags and boxes closed, put stickers on the boxes, and put the boxes on pallets. There were two bags per box, each bag weighing ten pounds, and eighty-four (84) boxes per pallet. Over the course of a regular eight hour shift, a crew of three employees completed three to four pallets.
4. With respect to the stipulated job videotape, plaintiff testified that the employees in the videotape worked at a slower pace than he worked. Plaintiff also testified that the scale system was different than the one on which he worked. Jeff Perry, the supervisor in the department and an individual who observed plaintiff's work, testified that the job videotape accurately portrayed the nature and pace of the job. Furthermore, Perry testified that the new scale system had no significant impact on the way the job was performed.
5. For this first couple of months in the paws room, plaintiff only performed the boxing job. On April 12, 1999, he was evaluated by Dr. Warren Burrows, an orthopedic who specializes in treating hand complaints, for swelling and soreness of the right wrist over the last few weeks. Dr. Burrows' examination revealed some diffuse swelling of the right wrist, with tenderness and limited range of motion. Dr. Burrows diagnosed plaintiff with moderate synovitis, placed plaintiff in a cast, and prescribed medication. Dr. Burrows also placed plaintiff on modified duty. Plaintiff was provided modified duty catching chickens. Perdue accepted compensability for plaintiff's synovitis and paid for his medical care as a result of this condition.
6. Plaintiff returned to Dr. Burrows on April 22, 1999, with continued swelling and tenderness in his right hand. Dr. Burrows ordered a new cast and continued plaintiff on modified duty.
7. When plaintiff returned to Dr. Burrows on May 6, 1999, the swelling and tenderness was considerably better. Dr. Burrows felt that plaintiff had resolving synovitis of the right wrist and allowed plaintiff to remain on modified duty.
8. Following physical therapy and medication over the next month, plaintiff continued to show improvement. Plaintiff returned to Dr. Burrows on June 7, 1999, and he allowed plaintiff to remain on modified duty for another month.
9. When plaintiff returned to Dr. Burrows on July 8, 1999, he was complaining of ulnar wrist pain, which Dr. Burrows felt was coming from the radial ulnar joint. Dr. Burrows injected the joint and left plaintiff on modified duty.
10. Plaintiff returned to Dr. Burrows on July 22, 1999, and his complaints were still the same. Dr. Burrows suspected plaintiff had some mild synovitis of the ulnar carpus. Dr. Burrows released plaintiff from his care, assigned a 3% PPD rating to the right hand, and released him to regular duty as long as plaintiff was not required to lift boxes weighing more than 15 to 20 pounds. Defendant paid plaintiff for the 3% PPD rating to his right hand due to synovitis on a Form 21 entered into on August 17, 1999.
11. Plaintiff subsequently returned to regular duty work. On plaintiff's return to work in late July 1999, he did not start rotating among the three job tasks immediately. However, after a meeting with the plant manager, plaintiff began rotating among the three jobs in the paws room. Plaintiff neither sought nor requested any additional medical treatment for his right wrist synovitis.
12. On a Saturday in late October/early November 1999, plaintiff's left hand swelled severely. On Sunday, plaintiff put ice on his hand because he thought that he had an infection. Plaintiff saw the plant physician, who also thought that the hand was infected, and who referred plaintiff to Dr. Diane Ryan.
13. Plaintiff first saw Dr. Ryan on November 3, 1999. Dr. Ryan is an internist who practices in Hamlet. Plaintiff was referred to Dr. Ryan due to an acutely swollen and discolored left hand. Plaintiff complained he had suffered symptoms for five days and had been seen in the emergency room on October 31, 1999. Plaintiff complained of a sudden onset of symptoms, after an incisional bite from a cat, which he kept as a pet a week to a week and a half earlier. Plaintiff did not relate any history of overuse of his hands to Dr. Ryan and did not attribute his problems in any way to his work with defendant.
14. Dr. Ryan found clinical signs of an irritation of plaintiff's left median nerve with positive Tinel's and Phalen's tests and limited range of motion of the left hand. At this time, carpal tunnel provocation tests of plaintiff's right hand were negative. Dr. Ryan prescribed medication, to reduce the swelling, and a splint. Dr. Ryan also did further diagnostic testing, which was normal. Plaintiff's condition did not improve and he was taken to see Dr. Saeb Bayazid for assessment.
15. Dr. Ryan arranged follow up with Dr. Bayazid for plaintiff's hands, further testing for his exertional dysphea, and a reminder to return to her for monitoring of his hypertension and obesity. Dr. Ryan did not offer any opinion on the etiology of plaintiff's hand complaints or whether his job with defendant placed him at an increased risk of developing those conditions as compared to members of the public not so employed.
16 Plaintiff was first evaluated by Dr. Saeb Bayazid on November 4, 1999. Dr. Bayazid is a general and vascular surgeon and is board certified in general surgery.
17. At this first visit with Dr. Bayazid, plaintiff denied any overuse of his hands, but did relate a recent cat scratch to his left hand. An EMG test from November 9, 1999, confirmed nerve entrapment in both hands. This test established that as of that time, plaintiff had damage to the nerves in both hands. Dr. Bayazid removed plaintiff from work, and on December 1, 1999, he performed a left carpal tunnel release on plaintiff. Plaintiff was out of work and paid short term disability benefits from an employer sponsored, non-contributory plan from November 10, 1999 through December 24, 1999. Plaintiff returned to work at the very end of December 1999, or in very early January 2000, in the paws room, but only worked in the jobs of grading and scales. Plaintiff did not perform the job of boxing after he returned to work following his surgery.
18. Plaintiff saw Dr. Bayazid again on February 14, 2000, complaining of right hand numbness, which had gotten worse over the last two weeks. As a result, Dr. Bayazid scheduled plaintiff for a right hand carpal tunnel release, which he performed on March 3, 2000. Plaintiff was again placed on a medical leave of absence and received disability benefits from an employer sponsored, non-contributory plan from March 3, 2000 through June 1, 2000. Plaintiff received a total of $2,817.20 in short term disability benefits from defendant.
19. Plaintiff's problem was significantly worse on the left side. However, Dr. Bayazid felt that the surgeries were done satisfactorily. Dr. Bayazid believed that after surgery plaintiff had improved close to 100% on the right hand, with some residual problems on the left hand, but that plaintiff had dramatically improved from his initial visit.
20. Based on plaintiff's return to work with defendant from January 6 through February 28, 2000, Dr. Bayazid could not offer an opinion as to whether plaintiff's return to work could have aggravated plaintiff's right carpal tunnel syndrome. Dr. Bayazid offered no opinion as to causation, aggravation, or whether plaintiff's job placed him at an increased risk developing or aggravating his condition as compared to members of the public not so employed.
21. Because plaintiff was continuing to complain of pain despite the surgeries, Dr. Bayazid referred plaintiff to Dr. Jennifer York, a neurologist. Dr. York has practiced medicine since 1993 and became board certified in neurology in 1997. Dr. York's primary field of practice is treating sleep disorders with only approximately 5-10% of her practice focusing on treating carpal tunnel syndrome.
22. Dr. York first evaluated plaintiff on May 4, 2000. Dr. York had no first hand knowledge of plaintiff's job with defendant. Dr. York was not sure if plaintiff had waited too long to have surgery and had unduly damaged the nerve, or if surgery damaged the nerve, or if there was some other problem. As a result, Dr. York ordered an EMG nerve conduction study, x-rays, and did some blood tests. Plaintiff's nerve conduction study showed abnormalities not only in the median nerve, but also in the ulnar nerve, suggesting a polyneuropathy.
23. Dr. York ultimately felt that plaintiff had a polyneuropathy superimposed on carpal tunnel, with excessive symptoms, which could be sympathetically maintained or represent a regional pain syndrome. According to Dr. York, the polyneuropathy is a separate condition from the carpal tunnel syndrome.
24. Dr. York believed that plaintiff's obesity and age were risk factors in his development of carpal tunnel syndrome. As a result, Dr. York could not say with any degree of certainty what caused plaintiff's carpal tunnel syndrome.
25. On January 23, 2001, plaintiff came under the care of Dr. Ward Oakley. Dr. Oakley has been a board certified orthopedic surgeon since 1982. At the first visit, Dr. Oakley detailed plaintiff's medical history and performed an examination on plaintiff. Dr. Oakley diagnosed plaintiff with bilateral carpal tunnel syndrome. Based on this diagnosis, Dr. Oakley re-released plaintiff's left hand on February 8, 2001. During surgery, Dr. Oakley noted that plaintiff's median nerve had a classic hourglass disfiguration with an inflamed appearance. The same was true for plaintiff's right hand, which Dr. Oakley re-released on April 10, 2001. According to Dr. Oakley, plaintiff's left hand was in worse condition and required twelve months after surgery to reach maximum medical improvement while plaintiff's right hand was at maximum medical improvement only nine months after surgery. After both hands reached maximum medical improvement (twelve months after surgery), Dr. Oakley felt plaintiff could return to light duty work.
26. With respect to causation, Dr. Oakley did not testify that plaintiff's job caused him to develop carpal tunnel syndrome.
27. When asked about whether plaintiff's description of his job could have aggravated a pre-existing tenosynovitis, Dr. Oakley could not agree to that statement with any degree of medical certainty, although he testified, in general terms and not specifically with reference to plaintiff's jobs, that it was possible for a job to aggravate a preexisting tenosynovitis. Dr. Oakley offered no testimony as to whether plaintiff's job placed him at an increased risk of developing or aggravating his condition as compared to members of the general public not so employed. Instead, he stated that no matter what plaintiff was going to do, he was going to aggravate his carpal tunnel syndrome to the point that it became symptomatic.
28. At the request of his attorney, plaintiff also received a one time evaluation with Dr. Gary Poehling on December 21, 2000. Dr. Poehling is a board certified orthopedic surgeon, who specializes in the treatment of upper extremities and hands. Dr. Poehling took a history and performed an examination of plaintiff, after which he opined that plaintiff had an element of chronic pain, and that plaintiff's symptoms in his right hand were relieved by surgery, except for some numbness, and that he had mild numbness and some weakness of the left hand.
29. In a letter to plaintiff's counsel dated February 26, 2001, Dr. Poehling changed his mind and stated that plaintiff's right hand was aggravated by his work at the paws room job and assigned a 15% PPD rating to that hand. This change in opinion was based on Dr. Poehling's understanding that plaintiff had returned to work prior to the onset of symptoms in his right hand. This opinion was rendered even though Dr. Poehling has never seen the paws room job or the videotape of the job. Dr. Poehling never classified the left carpal tunnel syndrome. Dr. Poehling did not testify that plaintiff's job placed him at an increased risk of developing or aggravating his right carpal tunnel syndrome as compared to workers of the general public not so employed.
30. Plaintiff's job was evaluated by Alan Gorrod, an ergonomist. Mr. Gorrod was a hospital based occupational therapist for a number of years and for twelve to thirteen years has been in private practice in the field of ergonomics. For the last four or five years, Mr. Gorrod has held a certificate as a certified work capacity evaluator. Mr. Gorrod has also completed a voluntary certification as a specialist in ergonomic evaluation. Since the 1980's, Mr. Gorrod has been licensed by the State of North Carolina as an occupational therapist. Mr. Gorrod has also been accepted by the North Carolina Court of Appeals as an expert in the field of ergonomics in an unpublished opinion.
31. On May 22, 2001, Mr. Gorrod evaluated the paw grader job at defendant's Rockingham facility. Mr. Gorrod performed this evaluation by observing actual workers at the plant for two hours, during which time he made the stipulated job videotape, which was entered into evidence. Mr. Gorrod also worked on the job to try it out. Mr. Gorrod described the three stages of the job as sorting paws, in which not every paw was handled, placing bags in boxes, and sealing the boxes and moving them to pallets.
32. In evaluating the job, Mr. Gorrod utilized the ergonomic risk factors identified by the National Institute of Occupational Safety and Health. In so doing, Mr. Gorrod found that in assessing the repetition of the job, on a scale of one to ten, for repetition the paws job rates as a two, or low on the scale, because of the varied tasks and intermittent breaks. Based on plaintiff's assertion that he was only doing boxing work initially, and that later he only alternated between grading and bagging, Mr. Gorrod's opinion as to repetition did not change. As far as forceful exertion, except in material handling, the job required little or no forceful exertion, and thus this factor also rated as a two, or low.
33. Mr. Gorrod's overall ergonomic risk rating concerning the job was that it received a score of less than two on a zero to ten scale, which meant that the job placed an employee at a low risk of developing a cumulative trauma disorder.
34. Since last working for defendant, plaintiff has not worked at any other job.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
The medical evidence fails to establish that plaintiff's employment with defendant caused or was a significant causal factor in the development or aggravation of plaintiff's carpal tunnel syndrome. Plaintiff also failed to prove that his employment placed him at an increased risk of developing or aggravating carpal tunnel syndrome as compared to members of the general public not so employed. Therefore plaintiff's claim must be denied. N.C.G.S. § 97-53(13)
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Plaintiff's claim is hereby denied.
2. Each side shall bear its own costs, except defendant shall pay expert witness fees of $300.00 to Dr. Jennifer York, $325.00 to Dr. Gary G. Poehling, $235.00 to Dr. Diane Ryan, and $300.00 to Dr. Saeb Bayazid, if these expert witnesses have not been heretofore paid.
This the ___ day of July 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER